UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

UNITED STATES OF AMERICA          :
                                  :
          v.                      :     No. 3:05CR204(EBB)
                                  :
BRANDON MILES                     :

### RULING ON DEFENDANT'S MOTION TO SUPPRESS

On August 18, 2005, in a one-count Indictment ("Indictment"), a Grand Jury charged the Defendant, Brandon Miles ("Defendant" or "Miles"), with knowingly and intentionally possessing with intent to distribute 5 grams or more of a mixture and substance containing a detectable amount of cocaine base ("crack"), a Schedule II Controlled Substance, in violation of Title 21, United States Code, Section 841(a)(1) and b(1)(B). On November 29, 2005, the Defendant moved to suppress "from evidence all fruits of the illegal conduct and search conducted on February 1, 2005 on the grounds that the officers acted without 'reasonable suspicion,' probable cause or warrant and in violation of Mr. Miles' constitutional rights." [Doc. No. 23]. A suppression hearing was held on March 23, 2006. Supplemental briefing was filed, and, in his post-hearing memorandum, Defendant concedes that the Terry stop was constitutionally proper based on the traffic violation that occurred at the time of the stop. See Defendant's Post Suppression Hearing Memorandum [Doc. No. 41] at 3-4. Thus, Defendant's remaining claims are that 1) Detective Lepore's pat down search exceeded the scope of a permissible Terry search and 2) the

Government has not shown that the search did not exceed the scope of consent given by Defendant.  For the reasons set forth below, the Court DENIES the motion to suppress.

I.  <u>FINDINGS OF FACT</u>

At the hearing, the Government presented the testimony of Detective Mark Lepore and Sargent Ronald Pine of the Norwalk, Connecticut, Police Department.  Defendant did not present any witness testimony.  The following facts, derived from the testimony at the hearing and the exhibits offered therein, have been found by a preponderance of the evidence.  See <u>United States v. Matlock</u>, 415 U.S. 164, 178 (1974) ("[T]he controlling burden of proof at suppression hearings should impose no greater burden than proof by a preponderance of the evidence.").

On the evening of February 1, 2005, at approximately 6:30 p.m., Officer Mark Lepore (now Detective), Sargent Pine and Officers Calise, Edwards and Osvalda were patrolling the area around the Colonial Village housing complex in Norwalk conducting selective narcotics enforcement.  The area is known for street-level narcotics trafficking and gun-related violence.  Law enforcement was also aware that the area is associated with the activity of the Westside Gang, the "Westsiders," a gang trafficking in crack cocaine and associated with several shootings.

Lepore and Pine testified that they knew that, in January of 2005, Thounsa Addison, a member of the Westsiders, had been shot

2

and killed in an area outside the housing complex.  On the day of that shooting, Lepore observed Christopher Miles, the Defendant's brother, enter and exit a vehicle registered to the victim's father.  After everyone left the scene, Lepore approached the vehicle and observed a handgun under the front passenger seat. Lepore testified that he knew from informants that Christopher Miles was trafficking in narcotics.

On February 1, 2005, Lepore and Calise entered the Colonial Village area in a marked patrol car while Pine, Edwards and Osvalda followed in an unmarked vehicle.  Five to ten people were gathered near a shrine that had been erected in remembrance of Addison on the side of Suncrest Road, a one-way street running through the housing complex.  Lepore testified that he immediately recognized two members of the Westsiders among the crowd.  Cars were parked on both sides of the street and a dark green Honda was double-parked on the right side of the road, almost straight across from the shrine, obstructing free passage along the road.  Lepore testified that the engine was running and there was at least one person in the car.  The patrol car was behind the Honda, and Lepore testified that, at that point, the driver of the Honda was committing a traffic violation.

Lepore shined his squad car "alley light" into the rear-view mirror of the Honda to give the driver a hint to move along.  The driver did not move his vehicle, and Lepore observed Christopher

Miles approach the Honda and engage in conversation with the driver. Lepore shined his alley light once more in the direction of the Honda. Christopher Miles looked at the patrol car, said something unintelligible and continued to talk with the person in the car. Lepore testified that at that point he believed the car was not going to move, so he turned on his overhead lights to effect a vehicle stop, pulled up closer behind the car and alighted. At that point, Christopher Miles opened the passenger side door and got into the car. The Honda then began slowly to pull away, at which point Lepore tapped on the back of the vehicle. The driver then stopped.

Lepore approached the driver's side of the vehicle and recognized the driver, Defendant Brandon Miles. Lepore had had several dealings with Defendant previously and knew that he was associated with the Westsiders, that confidential informants had made controlled purchases of narcotics from him and that he had been convicted of assault. Lepore asked Miles to produce his driver's license, registration and insurance card, and Miles complied. Lepore asked Miles why he had not moved his car; Miles did not respond. Lepore noticed that Miles had his feet together to the left of the brake pedal in an unusual posture and he asked Defendant to move his feet. Defendant did not respond; he stared straight ahead and did not look at the officer. At that point, Lepore became concerned that Defendant was concealing a weapon

4

underneath his feet and the floor mat and asked Defendant to step out of the vehicle.  After Defendant emerged from the vehicle, Lepore leaned into the driver's side area, lifted the floor mat and looked under the seat.  He found no weapon.  Lepore testified that he then turned to Defendant and said "do you have any weapons on you?"  Lepore further testified that Defendant responded "No, you can check me" and raised his hands straight up in the air.  Lepore testified that he understood this exchange to mean that Miles had no weapons on him and was allowing Lepore to search him.  Sargent Pine testified that Lepore asked Defendant if he could check him for weapons, to which Defendant responded "Go ahead, check me.  I don't have any weapons."

Miles was wearing a bulky sweat-shirt top with pockets. Lepore testified that his search was primarily for weapons, and the first thing he did was squeeze the right, front pocket on the sweat-shirt.  Using an open-handed pat, Lepore testified, an officer might miss small weapons, such as a razor blade or a small knife, so he usually squeezes pockets when conducting a search because his safety is his primary focus.  Upon squeezing Defendant's pocket, Lepore felt a hard, rock-like substance which, based upon his training and experience, he immediately recognized to be crack cocaine.  He then reached into the pocket and removed the item, which later tested positive as being crack cocaine. Lepore then placed Miles under arrest and handcuffed him.  Lepore

5

reached back into the same pocket and pulled out another piece of crack cocaine.  He then continued his search down to Defendant's feet.  No weapons were found on Defendant.  Sargent Pine read Defendant his Miranda rights.

II.  DISCUSSION

The Fourth Amendment protects "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."  U.S. Const. amend. IV.  "[N]o Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."  Id.

The Courts recognize a limited number of exceptions to this warrant requirement where exigent circumstances necessitate relief, and, therefore, a warrantless search which fits into one of these exceptions will not be deemed "unreasonable" under the Fourth Amendment.  One such exception to the warrant requirement is delineated in Terry v. Ohio, 392 U.S. 1 (1968), where the Supreme Court held that the police could detain an individual briefly for questioning and a subsequent "pat down" or frisk for weapons if an officer has "reasonable suspicion" that criminal activity "may be afoot."  Terry, 392 U.S. at 30.  Reasonable suspicion is something less than probable cause, but the Fourth Amendment requires at least "some minimal level of objective justification" for effecting a stop.  United States v. Sokolow, 490 U.S. 1, 7 (1989).  For a

6

court to find that an officer has acted reasonably in a particular circumstance, an officer must be able to articulate the "specific reasonable inferences which he is entitled to draw from the facts in light of his experience" rather than just an "inchoate and unparticularized suspicion or 'hunch.'" Terry, 392 U.S. at 27.

"As a general matter, the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred." Whren v. United States, 517 U.S. 806, 810 (1996).  When the conduct of the police is objectively reasonable, the subjective intent of a police officer in making a traffic stop will not invalidate the stop.  Id. at 811-12.  Here, once Defendant failed to move his double-parked car so that the free flow of traffic could resume, a traffic violation had occurred.  Although Defendant contests the constitutionality of the Terry stop in his Motion to Suppress, and contested such at the hearing, Defendant now concedes that the traffic violation gave Officer Lepore the constitutional basis to effect the Terry stop. See Defendant's Post Suppression Hearing Memorandum at 3-4.  Thus, this Court need not engage in further analysis of the decision to conduct the Terry stop.  However, Defendant argues that 1) Detective Lepore's "pat down" search exceeded the scope of a permissible Terry search and would have been constitutional only had Defendant consented to a full search of his person and 2) the Government has not shown that the search did not exceed the scope

of consent, if any, given by Defendant.

Defendant argues that, although the traffic violation gave Officer Lepore a constitutional basis for the "pat down," Terry and its progeny created a narrow scope, allowing for a search of weapons to protect the safety of police officers, but not allowing for a broadening of a search into a "general warrant to rummage and seize at will."  See Defendant's Memorandum at 6 (quoting Dickerson v. Minnesota, 508 U.S. 366, 378 (1993)).  Defendant further argues that Lepore's statement that he was checking Defendant "primarily for weapons" suggests that the officer was also searching the Defendant for other reasons, namely to discover contraband.  In fact, Defendant asserts, "Lepore's testimony is rendered inherently incredible by his cessation of the search upon immediately finding contraband in the first pocket he squeezed."  Defendant's Memorandum at 7.

As an initial matter, the subjective intent of an officer making a Terry stop is of no moment where the officer has an objectively reasonable basis for the stop.  Whren, 517 U.S. at 810.  See also United States v. Dhinsa, 171 F.3d 721, 724-25 (2d Cir. 1999) ("an officer's use of a traffic violation as a pretext to stop a car in order to obtain evidence for some more serious crime is of no constitutional significance").  Defendant has conceded that, due to the traffic violation, reasonable suspicion existed at the time Officer Lepore effected the vehicle stop.  Whether or not

Lepore's knowledge of narcotics sales in the area, gun violence or any other reason precipitated the stop or the decision to search Defendant, because he had an objective reason for the stop of Defendant, subjective intent is immaterial. <u>Whren</u>, 517 U.S. at 812-13. Furthermore, Lepore found the positioning of Miles's feet in the car rather unusual and, coupled with his knowledge that Defendant had sold narcotics to informants and was affiliated with the Westsiders, Lepore reasonably could have concluded that a weapon was being concealed. Thus he had "reasonable suspicion" to search Defendant for weapons. And, counter to Defendant's assertions regarding the credibility of Lepore's testimony, Lepore did not end his search upon discovering the crack cocaine in Defendant's sweat-shirt pocket. He testified that, after he placed Defendant under arrest, he pulled another piece of crack cocaine out of Defendant's pocket and then proceeded to search Defendant down to his feet, finding neither weapons nor additional contraband. Yet, Defendant contends, Lepore's squeezing of his pocket violated the narrow scope of <u>Terry</u>.

In <u>Terry</u>, the Supreme Court noted with approval that the officer did not conduct a "general exploratory search for whatever evidence of criminal activity he might find." 392 U.S. at 29-30. Rather, he only patted down the outer clothing of the Defendant and his companions, and did not reach into their pockets or under their outer clothing until he had felt weapons. <u>Id.</u> Thus, there was no

Fourth Amendment violation.   In contrast, in <u>Minnesota v. Dickerson</u>, 508 U.S. 380 (1993), the Court held that, while <u>Terry</u> "entitled [the officer] to place his hands upon respondent's jacket" in a search for weapons, the officer's subsequent discovery and seizure of contraband in the respondent's pocket violated the Fourth Amendment because the "incriminating character" of the lump in respondent's pocket had not been "immediately apparent." <u>Dickerson</u>, 508 U.S. at 375.   The officer's "continued exploration of respondent's pocket after having concluded that it contained no weapon was unrelated to the sole justification of the search." <u>Id.</u> A search for weapons must be confined to "an intrusion reasonably designed to discover guns, knives, clubs, or other hidden instruments for the assault of the police officer." <u>United States v. Casado</u>, 303 F.3d 440, 444 (2d Cir. 2002) (quoting <u>Terry</u>, 392 U.S. at 29).   In <u>Casado</u>, the Second Circuit found the search of Defendant's pocket violative of <u>Terry</u> where the officer, fearing a weapon was in Defendant's pocket, reached inside the pocket rather than first patting it down.   Thus, there was "no attempt at an initial limited exploration for arms." 303 F.3d at 447.   However, the Second Circuit did not exclude the possibility that something more than a pat down could be constitutional (citing in a footnote <u>United States v. Thompson</u>, 597 F.2d 187, 191 (9th Cir. 1979) (a direct reach into the pocket of an overcoat too bulky to be effectively patted down was held proper under <u>Terry</u>)). <u>Id.</u> at 448

n.4.  See also United States v. Mattarolo, 191 F.3d 1082, 1088 (9th
Cir. 1999) (holding the seizure of drugs constitutional where a pat
down revealed a cylindrical object that could not be ruled out as
a weapon until the officer followed up with "a precautionary
squeeze," at which point he was immediately alerted to the presence
of the drugs).   While Lepore's "squeeze-down" method may be
unconventional under Terry, he testified that this method is the
only way to ensure that a search for weapons in bulky clothing does
not miss something small such as a knife or razor blade.  Thus, his
search was more akin to an "initial limited exploration for arms,"
Casado, 303 F.3d at 447, and not to an attempt "to rummage and
seize at will."  Dickerson, 508 U.S. at 378.   The search for
weapons was an intrusion "reasonably designed" to discover what
might be concealed in the pocket of a bulky sweat-shirt top.
Casado, 303 F.3d at 444.  There was no invasion of the pocket prior
to the time it was "immediately apparent" to Lepore that the item
he squeezed through the outside surface of Defendant's clothing was
contraband.

This Court however, need not decide determinatively whether
the squeeze of the outer clothing went beyond the pat down
authorized in Terry and its progeny since, here, the Government
contends, and the Court agrees, that the search was conducted
pursuant to Defendant's consent.  It is well settled that a search
conducted pursuant to voluntary consent is one of the specifically

11

established exceptions to the warrant requirement. See Schneckloth v. Bustamonte, 412 U.S. 218, 219 (1973). To determine whether consent to a search is voluntarily given, courts examine "the totality of all the circumstances" to ascertain whether the consent "was a product of that individual's free and unconstrained choice, rather than mere acquiescence in a show of authority." United States v. Garcia, 56 F.3d 418, 422 (2d Cir. 1995) (citations omitted). Accord Schneckloth, 412 U.S. at 225. It is a fact-based inquiry. United States v. Peterson, 100 F.3d 7, 11 (2d Cir. 1996). Factors taken into consideration when assessing whether a defendant's "will was overborne" include, inter alia, the age, intelligence and education level of the defendant, whether a defendant is aware of his right to refuse consent, the length of the detention and the prolonged nature of any questioning, whether Defendant has had any prior contact with law enforcement, and whether any physical punishment or deprivation occurred. Schneckloth, 412 U.S. at 226; United States v. Gonzales, 79 F.3d 413, 421 (5th Cir. 1996). Consent can be voluntarily given even if a defendant is under arrest. See United States v. Crespo, 834 F.2d 267, 271 (2d Cir. 1987) ("That Crespo was under arrest and in custody, or even handcuffed, does not as a matter of law require a finding of coercion.").

Once it has been established that the consent to search was voluntary, the court must ascertain the scope of the consent given.

12

"The standard for measuring the scope of a suspect's consent under the Fourth Amendment is that of 'objective' reasonableness – what would the typical reasonable person have understood by the exchange between the officer and the suspect?" <u>Florida v. Jimeno</u>, 500 U.S. 248, 251 (1991). <u>Accord</u> <u>United States v. Snow</u>, 44 F.3d 133, 134-35 (2d Cir. 1995) (defendant's consent to search automobile extended to closed bag jammed under the back seat). The scope of a search is generally defined by its expressed object, and suspect can limit the breadth of the consent given. <u>Jimeno</u>, 500 U.S. at 251-52.

Here, the Government contends, and this Court agrees, that the totality of the circumstances suggests that Defendant's consent to the search of his person was voluntary. When asked if he had any weapons Defendant responded "No, and you can check me" and raised up his arms.[1] Defendant was not handcuffed or otherwise physically restrained during the initial search, and understood and responded to Lepore's inquiries. Furthermore, having had a previous conviction for assault and having been stopped and searched by the police "with no justification" previously, Defendant would have been aware of his right to refuse to consent. <u>See</u> Defendant's Affidavit in Support of Motion at ¶ 21. This was not a situation

---

[1]"In a society based on law, the concept of agreement and consent should be given a weight and dignity of its own. Police officers act in full accord with the law when they ask citizens for consent. It reinforces the rule of law for the citizen to advise the police of his or her wishes and for the police to act in reliance on that understanding. When this exchange takes place, it dispels inferences of coercion." <u>United States v. Drayton</u>, 536 U.S. 194, 207 (2002).

where Defendant merely acquiesced to a show of authority.

Defendant argues that, even if this Court finds the consent was voluntary, the search went beyond Defendant's consent to check him for weapons.  Testimony at the hearing established that Lepore constrained himself to an exploration of the outer surfaces of Defendant's clothing even after receiving consent.  The expressed object of the search was weapons, and Lepore did not reach into Defendant's pocket until he was immediately alerted to the presence of contraband.

A reasonable person would have understood the exchange between Lepore and Defendant to encompass Defendant's consent to a search of his person.  Defendant could have limited the breadth of the consent he gave, or given no consent at all, but he voluntarily raised his hands and offered Lepore the opportunity to "check" him. (And, under Terry, because Lepore had reasonable suspicion, he did not need Defendant's consent to a search for weapons.)

Where, as here, the "incriminating character" of the crack cocaine in Defendant's sweat-shirt pocket was "immediately apparent" to Officer Lepore upon squeezing Defendant's pocket, the seizure is valid under the plain-view doctrine. Dickerson, 508 U.S. at 375.  Furthermore, "[i]f the frisk for a weapon is conducted in compliance with proper standards and results in recognition of the likely presence of narcotics, it is immaterial that what was discovered is not the article for which the police

14

officers were originally and specifically looking." <u>United States</u> <u>v. Salazar</u>, 945 F.2d 47, 51 (2d Cir. 1991).

Additionally, "a suspect's failure to object (or to withdraw his consent) when an officer exceeds limits allegedly set by the suspect is a strong indicator" that the search was within the scope of the initial consent. <u>United States v. Jones</u>, 356 F.3d 529, 534 (4th Cir. 2004). The Court is mindful of the Supreme Court's admonition against "stealthy encroachments" upon the rights of citizens, but here, where Defendant consented voluntarily to a search of his person, such concerns are not founded. <u>See</u> <u>Schneckloth</u>, 412 U.S. at 228-29.[2]

CONCLUSION

Because the vehicle stop of Defendant was based upon a traffic violation, and the subsequent search of Defendant's person was conducted with Defendant's voluntary consent, Defendant Brandon Miles has failed to show that the search of his person violated his

---

[2]"It may be that it is the obnoxious thing in its mildest and least repulsive form; but illegitimate and unconstitutional practices get their first footing in that way, namely, by silent approaches and slight deviations from legal modes of procedure. This can only be obviated by adhering to the rule that constitutional provisions for the security of person and property should be liberally construed. A close and literal construction deprives them of half their efficacy, and leads to gradual depreciation of the right, as if it consisted more in sound than in substance. It is the duty of courts to be watchful for the constitutional rights of the citizen, and against any stealthy encroachments thereon."
<u>Schneckloth</u>, 412 U.S. at 228-29 (quoting <u>Boyd v. United States</u>, 116 U.S. 616, 635 (1886)).

rights under the Fourth Amendment, and his Motion to Suppress the evidence seized from his person [Doc. No. 23] is DENIED.

SO ORDERED.

_____
ELLEN BREE BURNS, SENIOR JUDGE
UNITED STATES DISTRICT COURT

Dated at New Haven, Connecticut this ___ day of May, 2006.